**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **In re:**<br><br>**CRISTÓBAL M. GALINDO, P.C.**<br>**D/B/A GALINDO LAW FIRM,**<br><br>**Debtor.**[1] | **Chapter 11**<br><br>**Case No. 26-90764** |

**DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING USE OF CASH COLLATERAL, TO THE EXTENT APPLICABLE, AND GRANTING RELATED RELIEF**

**Emergency relief has been requested. Relief is requested not later than 4:30 p.m. on August 26, 2026.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on August 26, 2026 at 4:30 p.m. in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002.**

**Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Perez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Perez's homepage. The meeting code is "JudgePerez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Perez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

[1] The Debtor's address is 18000 Groeschke Road, Suite A-7, Houston, Texas 77084, and the last four digits of the Debtor's federal tax identification number is 5859.

COMES NOW Cristóbal M. Galindo, P.C. d/b/a Galindo Law Firm, the above-captioned Debtor (the "Debtor" or "GLF") and, pursuant to 11 U.S.C. §§ 105, 361, 362, and 363 of the United States Bankruptcy Code (the "Bankruptcy Code") and rules 4001(b), 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as well as this Court's Local rules and Procedures for Complex Cases in the Southern District of Texas (the "Local Rules" and "Complex Case Procedures"), files this *Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing Use of Cash Collateral, to the Extent Applicable, and Granting Related Relief* (the "Motion"). The Debtor will respectfully show as follows:

## PRELIMINARY STATEMENT

1. On August 24, 2026 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, initiating this case (the "Case"). The Debtor continues to operate its business and manage its property as debtor in possession. No trustee or examiner has been appointed in the Case.

2. The Debtor is a Texas professional corporation and law firm that has operated since 2001. GLF represents and is ethically responsible for more than 20,000 clients nationwide and focuses primarily on first-party insurance, personal injury, and mass tort claims.

3. The Debtor seeks authority to use Cash Collateral, to the extent any cash, deposit-account funds, collections, proceeds, attorney-fee receipts, expense reimbursements, or other cash equivalents constitute "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code ("Cash Collateral"). The Debtor seeks this relief out of an abundance of caution and without prejudice to its rights to dispute the validity, priority, enforceability, perfection, extent, or amount of any asserted lien or other interest in any property of the estate.

4. The Debtor also seeks an interim ruling, pending a final hearing, that incoming

cash acquired by the estate after the Petition Date is not subject to any prepetition lien or security interest resulting from a prepetition security agreement because, as discussed in more detail herein, section 552(a) generally cuts off after-acquired property liens after the commencement of the case, and section 552(b) provides only a limited exception for qualifying proceeds, products, offspring, rents, or profits of prepetition collateral.

5. CMG Funding 2024 LLC, CMG Funding 2025 LLC, Deer Finance, LLC, JBSL Legal Finance LLC, and any other entity determined to hold an interest in Cash Collateral are referred to herein collectively as the "Prepetition Secured Parties". The Debtor disputes and reserves all rights regarding the validity, priority, enforceability, perfection, extent, and amount of any asserted lien, claim, security interest, or other interest of the Prepetition Secured Parties.

6. That interim determination is important here because GLF's revenue primarily consists of attorneys' fees derived from client recoveries, which are initially deposited into IOLTA accounts, and GLF's interest in those funds is contingent until the client has executed required documentation, the client has received its share of the settlement, and the fee is earned. GLF intends to challenge any alleged security interest in IOLTA funds or future recoveries from continued client representation.

7. GLF's ability to maintain client services, preserve case value, comply with trust-account obligations, and pursue a value-maximizing reorganization depends on immediate access to operating liquidity. The requested relief will allow the Debtor to fund only those expenses identified in the budget attached as Exhibit A to this Motion (the "Budget"), subject to the terms of the interim order attached hereto and any final order entered after notice and a hearing (the "Final Order").

8. For the avoidance of doubt, the Debtor does not seek authority to use client funds.

Client funds are maintained in IOLTA accounts and are not commingled with funds attributable to operations or income. Nothing in this Motion seeks a determination that client funds held in IOLTA accounts are property of the estate or available to fund operating expenses.

## RELIEF REQUESTED

9. The Debtor requests entry of the Interim Order and, after a final hearing, the Final Order:

a. authorizing the Debtor to use Cash Collateral, to the extent applicable, in accordance with the Budget;

b. determining on an interim basis, pending the final hearing and without prejudice to the rights of parties in interest, that incoming postpetition cash, including cash acquired by the estate after the Petition Date from postpetition operations, postpetition services, postpetition recoveries, or postpetition-earned fees, is not Cash Collateral and is not subject to any secured position of the Prepetition Secured Parties;

c. authorizing use of Cash Collateral during the interim period in an amount up to $127,957 for the period from the Petition Date through the week ending September 18, 2026, subject to any permitted variance set forth in the Interim Order. The requested interim cap equals projected disbursements through the week ending September 18, 2026, and the requested final cap equals projected operating and bankruptcy disbursements through the week ending January 1, 2027;

d. authorizing use of Cash Collateral on a final basis in an amount up to $594,305 through the week ending January 1, 2027, subject to the Budget, any permitted variance set forth in the Final Order, and further order of the Court;

e. granting adequate protection to Prepetition Secured parties and any

other entity determined to hold an interest in Cash Collateral but solely to the extent of any diminution in value of any Prepetition Secured Parties' interest in Cash Collateral and subject to the Debtor's reservation of rights;

f. determining that any interim use of incoming postpetition cash that is not Cash Collateral does not require adequate protection, replacement liens, or other secured-party protections under sections 361 or 363 of the Bankruptcy Code;

g. modifying the automatic stay solely to the extent necessary to implement the terms of the Interim Order and Final Order; and

h. granting related relief.

10. The Debtor requests that the Court schedule a final hearing on this Motion in the ordinary course.

## JURISDICTION AND VENUE

11. The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

12. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## CONCISE STATEMENT OF THE MATERIAL TERMS OF THE INTERIM ORDER

13. The below chart contains a summary of the material terms of the Interim Order, as required by Bankruptcy Rule 4001(b)(1)(B) and the Complex Case Procedures:[2]

| Summary of Material Terms | | Location |
|---|---|---|
| **Parties with an Interest in Cash Collateral** Bankruptcy Rule 4001(b)(1)(B) | CMG Funding 2024 LLC, CMG Funding 2025 LLC, Deer Finance, LLC, JBSL Legal Finance LLC, and any other entity determined to hold an interest in Cash Collateral. | ¶ 5 |

[2] Any summary of the Interim Order's provisions herein is qualified in its entirety by reference to the Interim Order. The Interim Order will control in the event of any inconsistency between this motion and the Interim Order.

| | | |
|---|---|---|
| **Cash collateral to be used** | Cash, deposit-account funds, collections, proceeds, attorney-fee receipts, expense reimbursements, and other cash equivalents, solely to the extent they constitute Cash Collateral. | ¶ 5<br><br>Order ¶ 3 |
| **Purposes for Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B) | Cash Collateral will be used in accordance with the Budget (as defined herein) to (A) permit the orderly continuation of its business, and (B) pay the costs of administration of its estate and satisfy other working capital and general corporate purposes of the Debtor. | ¶¶ 7, 9<br><br>Order ¶ 6 |
| **Interim period and amount** | Up to $127,957 for the period from the Petition Date through the week ending September 18, 2026, in accordance with the Budget. | ¶ 9(c)<br><br>Order ¶ 20 |
| **Final period and amount** | Up to $594,305 through the week ending January 1, 2027, in accordance with the Budget and further order of the Court. | ¶ 9(d) |
| **Budget**<br>Bankruptcy Rule 4001(b)(1)(B) | Use of Cash Collateral is limited to the Budget attached as Exhibit A, subject to any permitted variance approved in the Interim Order or Final Order. | ¶¶ 7, 9<br><br>Order ¶¶ 3, 4, 5, 6, 11(b) |
| **Adequate Protection**<br>Bankruptcy Rule 4001(b)(1)(B) | Subject to the Debtor's reservation of rights, and solely to the extent any Prepetition Secured Party is determined to hold a valid, perfected, enforceable, non-avoidable interest in Cash Collateral, the Debtor proposes adequate protection limited to any postpetition diminution in value of such interest. Such adequate protection consists of replacement liens only to the extent set forth in the Interim Order, reporting, reasonable access to books and records, segregation of disputed prepetition expense reimbursements, and such other relief as the Court orders. | Order ¶ 11 |
| **Carve-out** | The Interim Order provides for payment of allowed professional fees, U.S. Trustee fees, claims agent, professional fees, and committee fees. | Order ¶¶ 2, 7, 12, 14 |
| **Challenge rights** | The Interim Order preserves rights to investigate and challenge asserted liens, claims, obligations, collateral descriptions, perfection, priority, enforceability, and | Order ¶ 18 |

| | | |
|---|---|---|
| | amounts, subject to the limitations and deadlines set forth in the Interim Order. | |
| **Modification of Automatic Stay** Bankruptcy Rule 4001(b)(1)(B) | The automatic stay is modified solely to the extent necessary to implement the Interim Order. | Order ¶ 19 |

## FACTUAL BACKGROUND

### A. The Debtor's Business

14. GLF is a Texas-based law firm incorporated as a professional corporation on March 5, 2001.

15. Since approximately 2021, GLF expanded from single personal-injury and property-damage matters into mass-tort dockets, including Zantac, Roundup, and Camp Lejeune matters, and developed a system for case acquisition and administration.

16. GLF's contingency-fee agreements generally provide that no amount is owed to GLF unless and until there is a settlement or successful litigation and the client has received a distribution.

17. GLF uses co-counsel arrangements with other law firms to expand its capacity to represent clients, while maintaining responsibility for ensuring that clients are represented consistent with applicable professional obligations.

### A. Prepetition Financing and Asserted Liens

18. On May 9, 2024, GLF and Galindo & Mott, LLP, as borrowers, entered into a $25,000,000 credit agreement with CMG Funding 2024 LLC as lender and administrative agent, Deer Finance, LLC as servicer, and JBSL Legal Finance LLC as participation administrator.

19. On February 26, 2025, GLF and Galindo & Mott, LLP, as borrowers, entered into a second credit agreement in the stated amount of $45,000,000 with CMG Funding 2025 LLC as

lender and administrative agent, Deer Finance, LLC as servicer, and JBSL Legal Finance LLC, which restructured and refinanced existing obligations to provide continued liquidity.

20. The credit facility used a borrowing base tied to the estimated value of GLF's eligible cases, including mass-tort dockets, and funding depended on the borrowing base, compliance with covenants, and information provided regarding cases on the docket.

21. The Prepetition Secured Parties assert that obligations under the prepetition credit documents are secured by a first-priority lien on substantially all of GLF's assets, including case inventory and fees, deposit accounts other than IOLTA accounts, and general intangibles.

22. GLF disputes the amount, validity, extent, enforceability, priority, and perfection of certain asserted liens and claims, including any asserted lien on IOLTA funds, unearned fees, future recoveries, case, client agreements, co-counsel agreements, and other disputed categories of property. GLF's position is that settlement proceeds remain in IOLTA accounts and that any GLF interest in those funds is contingent until the client has executed required documentation and received its share of any settlement.

23. GLF also contends that no security interest could attach to fees that have not yet been earned because doing so would implicate restrictions on fee-sharing with a non-lawyer, and GLF disputes the principal amount of the Prepetition Secured Parties' claims.

24. The Debtor nevertheless brings this Motion out of an abundance of caution to avoid any interruption in operations while reserving all rights to challenge any asserted lien, claim, or interest.

25. The Debtor has other unsecured claims outstanding as of the Petition Date, consisting mostly of ordinary-course trade debt, litigation-related claims, and accounts payable to vendors.

26. The Debtor has determined that existing cash, together with cash generated from operations and the relief requested in the Motion, is expected to be sufficient to permit the Debtor to continue operating during the Budget period, subject to the assumptions and limitations set forth in the Budget.

**A. Cash Management and Cash Collateral Issues**

27. GLF maintains its banking relationship with JPMorgan Chase Bank, N.A. and uses a centralized cash management system to collect, transfer, and disburse funds generated by its legal operations.

28. GLF maintains eight bank accounts, including an operating account, several IOLTA accounts, a DACA-related account, and collection or specialized accounts used in connection with legal operations and client funds.

29. GLF's revenue primarily consists of attorneys' fees derived from client recoveries, which are initially deposited into IOLTA accounts, and funds belonging to clients are not deposited into non-IOLTA accounts.

30. Under the prepetition cash-management arrangement, the account ending in x6963 was governed by a DACA between CMG and Chase and automatically diverted 75% of certain funds to the Lender while transferring 25% to the operating account.

31. GLF incurs approximately $2,315.50 per month in bank fees to maintain its cash management system.

32. The Debtor has filed a separate cash-management motion seeking authority to continue operating its cash management system and maintain existing bank accounts, and that motion explains that the system is important to daily operations and client trust obligations.

**THE DEBTOR'S IMMEDIATE NEED FOR THE USE OF CASH COLLATERAL**

33. The Debtor requires immediate authority to use Cash Collateral, to the extent applicable, to preserve its business, maintain client services, fund necessary administrative and operating expenses, and avoid disruption to the estate.

34. The Debtor also requires an interim determination regarding incoming postpetition cash. Without such a determination, the Prepetition Secured Parties may assert a secured position in all incoming cash, even though section 552(a) generally prevents prepetition security agreements from attaching to property acquired by the estate after the Petition Date unless the limited exception in section 552(b) applies.

35. Any disruption to GLF's cash management system would risk paralyzing GLF's daily operations and interrupting critical disbursements or client-related processes for a firm responsible for more than 20,000 clients.

36. GLF's restructuring objectives include filing a plan of reorganization, pursuing determinations regarding claims involving co-counsel firms or other third parties, seeking authority to use any alleged Cash Collateral, challenging alleged security interests in IOLTA funds or future client recoveries, and exploring avoidance actions.

37. The Budget was prepared by the Debtor with the assistance of its financial advisor, Harney Partners, based on the Debtor's books and records, projected receipts, projected operating disbursements, and projected restructuring-related expenses. The Budget reflects the Debtor's good-faith estimate of the limited cash required to maintain operations, preserve estate value, continue client-service functions, and administer this chapter 11 case during the Budget period.

## RELIEF REQUESTED AND BASIS THEREFOR

### A. Use of Cash Collateral

38. Section 363(c) of the Bankruptcy Code provides that a debtor-in-possession may

use cash collateral if all interested entities consent or the Court, after notice and a hearing, authorizes such use. Moreover, Section 363(e) of the Bankruptcy Code requires that the use of cash collateral be prohibited or conditioned as is necessary to provide adequate protection to persons that have an interest in cash collateral. *In re DeSardi*, 340 B.R. 790, 797 (Bankr. S.D. Tex. 2006). Jointly, these provisions authorize a debtor-in-possession to use a secured creditor's cash collateral if the relevant creditors consent or their collateral is adequately protected.

39. Any use of Cash Collateral must be authorized by consent of each entity with an interest in such Cash Collateral or by Court order after notice and a hearing. The Debtor bears the burden of demonstrating adequate protection to the extent required for any use of Cash Collateral, while reserving all rights to contest the validity, priority, perfection, enforceability, extent, and amount of any asserted lien, claim, or interest.

40. While the Bankruptcy Code does not define "adequate protection", section 361 offers non-exclusive examples of what may constitute adequate protection: (1) periodic cash payments equal to the reduction of the creditor's interest in the property; (2) an additional or replacement lien on other unencumbered property of the debtor; or (3) other relief that will provide the indubitable equivalent of the creditor's interest in the property. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 793 F.2d 1380, 1388 (5th Cir. 1986).

41. A hearing on use of cash collateral may be preliminary or may be consolidated with a hearing on adequate protection, and if the hearing is preliminary, the Court may authorize use only if there is a reasonable likelihood that the debtor will prevail at the final hearing.

42. When adequate protection is required, it may be provided by cash payments, additional or replacement liens, or other relief that will result in the realization of the indubitable equivalent of the protected entity's interest.

43. In the case at bar, the Debtor's use of Cash Collateral is necessary and should be approved.

44. The Debtor's business is a going-concern legal practice whose value depends on continued client service, case administration, co-counsel coordination, banking continuity, and the ability to fund ordinary-course operating expenses.

45. The Debtor cannot preserve that value without immediate access to Cash Collateral, to the extent applicable. The firm's revenue model depends on contingency-fee recoveries, and no fee is owed unless the relevant contingency occurs and the client has received a distribution.

46. The Budget limits the requested use to necessary expenses for the Debtor's operations and administration of this Case. That disciplined use protects value for all stakeholders by allowing GLF to continue servicing the matters that generate estate value.

47. The requested authority is particularly important because GLF maintains responsibility for more than 20,000 clients nationwide and relies on a cash management system that supports daily operations and client trust obligations.

48. Without authority to use Cash Collateral, GLF faces immediate operational disruption, harm to client-service infrastructure, and diminution in the value of the estate's potential recoveries.

49. Additionally, the Debtor's proposed grant of adequate protection is appropriate.

50. Subject to all reservations of rights, and solely to the extent any Prepetition Secured Party holds a valid, perfected, enforceable, non-avoidable interest in Cash Collateral, the Debtor proposes adequate protection limited to any postpetition diminution in value of such interest.

51. Moreover, the Prepetition Secured Parties are adequately protected by virtue of the Debtor's proposed use of the Cash Collateral, in that the Debtor's use of Cash Collateral to pay

necessary expenses will prevent degradation of the value of the Prepetition Collateral that would occur if such amounts were not paid, to the benefit of the Prepetition Secured Parties and all other stakeholders. The use of Cash Collateral to preserve or enhance the value of a secured creditor's collateral can constitute "adequate protection" for Bankruptcy Code purposes. *See, e.g.*, *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral); *In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that debtor's use of cash collateral from shopping center to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor).

52. The Debtor believes the proposed adequate protection, as set forth in the Interim Order, is necessary to protect against diminution in value, as required by sections 363(c)(2) and 363(e) of the Bankruptcy Code. The Debtor further believes that the provision of the proposed adequate protection is fair and appropriate under the circumstances of this chapter 11 case to ensure the Debtor is able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates. Accordingly, the Debtor respectfully submits that the proposed forms of adequate protection should be approved.

## B. The Court Should Determine on an Interim Basis That Incoming Postpetition Cash Is Not Subject to the Prepetition Secured Parties' Asserted Secured Position

### a. Section 552(a) cuts off the Prepetition Secured Parties asserted postpetition liens

53. Section 552(a) and (b)(1) provide:

> **(a)** Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of

> the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.
> **(b) (1)** Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552(a) and (b)(1) (LEXIS 2026).

54. Thus, unless section 552(b)(1) applies,[3] property acquired by the bankruptcy estate post-petition is not subject to any lien resulting from a pre-petition security agreement.

55. Generally speaking, if property is brought into existence as the fruit of a debtor's post-petition labor, it is not subject to pre-petition liens. *Local Loan Co. v. Hunt*, 292 U.S. 234 (1934).

56. Further, the United States Bankruptcy Court for the Northern District of Texas has explained that where post-petition revenues require ongoing business operations, professional services, and estate expenditures, those funds constitute after-acquired property governed by § 552(a), rather than § 552(b) passive proceeds. *In re Cafeteria Operators, L.P.*, 299 B.R. 400, 405, 410 (Bankr. N.D. Tex. 2003); *see also* 5 Collier on Bankruptcy ¶ 552.02[2]). As Judge Hale explained in *Cafeteria Operators*, revenues produced through ongoing post-petition operations are not subject to a pre-petition blanket security interest because they represent "in large part, the proceeds of Debtors' post-petition toil and effort." *Cafeteria Operators,* 299 B.R. at 410.

57. In the instant case, GLF's active dockets require substantial post-petition attorney

[3] (b)(2) applies to "rooms and other public facilities in hotels, motels, or other lodging properties".

hours, staff overhead, and direct case expenses to generate settlement proceeds. Further, because contingent attorney's fees are not earned until a settlement or judgment is reached, any matters that were unsettled or not reduced to judgment as of the petition date necessarily require postpetition efforts. Because these legal fees are earned and thus produced through GLF's post-petition labor, operations, professional services, and firm working capital, § 552(a) severs CMG's floating lien upon filing.

58. Funders routinely argue that post-petition settlement realizations are proceeds under § 552(b)(1). This argument fails under *Qualcomm Inc. v. North Water Intellectual Property Fund LP 3A* (*In re Gabriel Technologies Corp.*) wherein the Bankruptcy Court for the Northern District of California explained that it is hornbook law that a security interest cannot attach to proceeds under UCC Article 9 unless the security interest existed in the *original collateral* before proceeds were created. Adv. Proc. No. 17-03057, 2017 WL 6016287 (Bankr. N.D. Cal. Dec. 4, 2017). A lien on proceeds is legally distinct from a lien on the underlying claim.

59. To avoid state ethics rules against non-lawyer ownership or control of client lawsuits (Texas Rule 5.04), CMG disclaims holding a direct security interest in the client's underlying lawsuit (*see* Credit Agreement § 9.25). Under *Qualcomm*, by disclaiming a pre-petition lien on the underlying lawsuit itself, the funder possesses no pre-petition collateral from which post-petition proceeds can arise.

60. Therefore, because CMG had no attached pre-petition lien on active, unsettled lawsuits, post-petition settlement deposits are not § 552(b)(1) proceeds and 552(a) cuts off CMG's lien completely.

61. Finally, any argument that CMG's Credit Agreement requires collections to be held in trust must be rejected. In *In re Harvest Sherwood Food Distributors, Inc.*, 676 B.R. 748,

2025 WL 3178864 (Bankr. N.D. Tex. Nov. 13, 2025), the funder (Burford Capital) argued that its contract required litigation proceeds to be held in trust and paid through a priority waterfall. *Id.* at 756. The bankruptcy court rejected this, holding that because litigation proceeds did not exist prepetition, there was no delivery of a "trust *res*". *Id.* at 768 The court ruled that contractual trust does not elevate a funder's priority in bankruptcy; it merely creates a standard, general unsecured contract claim. *Id.* at 772. *See also, e.g.*, *Southmark Corp. v. Grosz* (*In re Southmark Corp.*), 49 F.3d 1111, 1117 (5th Cir. 1995); *see also Pineda REO, LLC v. Weir Bros, Inc.*, Civil Action No. 3:18-CV-1660-N, 2020 U.S. Dist. LEXIS 43508, at *18-20, 125 A.F.T.R.2d (RIA) 2020-1241 (N.D. Tex. 2020) (explaining, in pertinent part: "[t]o establish an express trust, Texas trust law requires that 'the settlor manifests an intention to create a trust' and that the beneficiary and trust *res* are identified. The Fifth Circuit has held, however, that mere formulaic recitations of trust language are insufficient to create an express trust. . . . It is well established that if a ritualistic incantation of trust language were deemed conclusive, it would be a simple matter for one creditor, at the expense of others, to circumvent the rules pertaining to the creation of *bona fide* security interests.") (internal citations and quotations omitted).

62. Finally, even if CMG could colorably argue that post-petition fee realizations represent proceeds under § 552(b)(1), the Court retains broad statutory authority to limit or eliminate the lien "based on the equities of the case".

63. The § 552(b)(1) equities exception permits the Court to evaluate estate expenditures, firm overhead, and attorney labor to adjust proceeds distributions and prevent an unearned windfall to a secured lender (5 Collier on Bankruptcy ¶ 552.02[4]). As Judge Hale reasoned in *Cafeteria Operators*, granting a pre-petition lender a blanket lien over post-petition cash derived from the debtor's "post-petition toil and effort" and estate resources "would

represent a windfall to [the lender], in the face of Debtors' utilization of estate resources, i.e. the services of their employees, to increase the value of [lender's] collateral, and would unfairly deplete the funds available for general unsecured creditors." *Cafeteria Operators*, 299 B.R. at 410.

64. The equities in the instant case also weigh in favor of limiting the Prepetition Secured Parties' asserted postpetition liens because to grant the Prepetition Secured Parties a blanket lien on all incoming recoveries would potentially render the Debtor unable to operate and potentially leave thousands of clients without sufficient representation.

**b. Concerns regarding prepetition liens**

65. Although the matter likely needs to be raised in another procedural vehicle, the Debtor notes that it disputes that any lien can attach to client funds, unearned fees, or future recoveries before any estate interest exists and before the applicable fee is earned and severed from client funds.

**c. Scope of Request**

66. The Debtor does not ask the Court to adjudicate all lien issues finally at the interim hearing. Instead, the Debtor requests an interim determination for purposes of the Interim Order that incoming postpetition cash is not Cash Collateral and is not subject to the Prepetition Secured Parties' alleged secured position.

67. The requested interim determination also aligns adequate protection with the interests actually at issue. If incoming postpetition cash is not Cash Collateral, no adequate protection is required for the Debtor's use of that cash. Adequate protection should apply only to the extent of any postpetition diminution in value of a valid, perfected, enforceable, non-avoidable interest in Cash Collateral.

68. Accordingly, the Interim Order should provide, without prejudice and without final adjudication of lien validity or extent, that incoming cash acquired after the Petition Date is not subject to any secured position of the Prepetition Secured Parties.

## NOTICE OF THIS MOTION

69. The Debtor will provide notice of this Motion to: the Office of the United States Trustee for the Southern District of Texas; each Prepetition Secured Party; known counsel for each Prepetition Secured Party; JPMorgan Chase Bank, N.A.; the holders of the thirty largest unsecured claims; any official committee appointed in this Case; all parties who have appeared and requested notice; applicable governmental agencies to the extent required by the Bankruptcy Rules, Local Rules, or Complex Case Procedures; and all other parties entitled to notice under Bankruptcy Rule 4001.

## COMPLEX CASE PROCEDURE

70. The Debtor submits this Motion in accordance with the Complex Case Procedures. The Budget provides weekly sources and uses of cash for not less than the first three weeks of the Case, and the Debtor will provide a native-file copy upon request. The Interim Order does not include any sale or plan-confirmation milestones, cross-collateralization, roll-up, liens on avoidance actions or proceeds, self-executing stay termination, waiver of challenge rights, limitation on committee professional fees, non-consensual priming liens, or other provision limiting estate fiduciaries, except as expressly disclosed in the chart below.

WHEREFORE, the Debtor respectfully requests that the Court enter the Interim Order and, after a final hearing, the Final Order:

a) authorizing the Debtor to use Cash Collateral, to the extent applicable, in accordance with the Budget;

b) authorizing interim use of Cash Collateral in an amount up to $127,957 through the week ending September 18, 2026;

c) authorizing final use of Cash Collateral in an amount up to $594,305 through the week ending January 1, 2027, subject to the Budget, any permitted variance, and further order of the Court;

d) approving the Budget for purposes of the Debtor's use of Cash Collateral;

e) granting adequate protection solely to the extent required and solely for any postpetition diminution in value of valid, perfected, enforceable, non-avoidable interests in Cash Collateral;

f) determining on an interim basis, without prejudice to any party's rights, that incoming postpetition cash is not subject to any secured position of the Prepetition Secured Parties except to the extent such party establishes that the cash constitutes identifiable proceeds, products, offspring, rents, or profits of valid, perfected, enforceable, non-avoidable prepetition collateral and otherwise constitutes Cash Collateral;

g) approving the carve-out set forth in the Interim Order;

h) modifying the automatic stay solely to the extent necessary to implement the Interim Order and Final Order;

i) scheduling a final hearing on this Motion; and

j) granting such other and further relief as the Court deems just and proper.

Dated: August 25, 2026

Respectfully submitted,

**HAYWARD PLLC**

By: */s/Charlie Shelton*
Charlie Shelton
Texas State Bar No. 24079317
7600 Burnet Road, Suite 530

Austin, TX 78757
(737) 881-7100 (Phone/Fax)
cshelton@haywardfirm.com

***and***

Deborah D. Williamson
State Bar No. 21617500
dwilliamson@dykema.com
Danielle Rushing Behrends
State Bar No. 24086961
dbehrends@dykema.com
Aaron E. Lozano
State Bar No. 24125803
alozano@dykema.com
112 East Pecan Street, Suite 1800
San Antonio, Texas 78205
Telephone: (210) 554-5500
Facsimile: (210) 226-8395

**PROPOSED COUNSEL FOR THE DEBTOR AND DEBTOR IN POSSESSION**

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

/s/*Charlie Shelton*
Charlie Shelton

**Certificate of Service**

I certify that on August 25, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas and to be served as set forth in the Affidavit of Service to be filed by the Debtor's proposed noticing agent.

/s/*Charlie Shelton*
Charlie Shelton